[Cite as *State v. Harbut*, 2024-Ohio-4811.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2024-CA-14 |
| | : | |
| v. | : | Trial Court Case No. 23-CR-0636 |
| | : | |
| JULIUS HARBUT | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on October 4, 2024

. . . . . . . . . . .

CHRISTOPHER BAZELEY, Attorney for Appellant

ROBERT C. LOGSDON, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Julius Harbut appeals from his conviction, following a jury trial, on one count of having weapons while under disability and one count of tampering with evidence. He argues that his convictions were supported by insufficient evidence and were against the

manifest weight of the evidence, that the prosecutor engaged in misconduct, that his right to allocution was violated, that jail-time credit was not properly imposed, and that the trial court's order of forfeiture of a gun was improper.

{¶ 2} We agree that jail-time credit was not properly imposed, and we reverse that portion of the judgment and remand for proper imposition of jail-time credit. We also agree that the forfeiture was improper because the jury did not make a finding that the weapon was subject to forfeiture, and we vacate that portion of the judgment. In all other respects, the judgment of the trial court is affirmed.

### Facts and Procedural History

{¶ 3} The charges against Harbut arose from an altercation that occurred on the morning of September 11, 2023, at the home of Harbut's former girlfriend, A.O., after she and Harbut had spent the previous day and evening together. At around 5:00 a.m., Harbut and A.O. got into an argument and physical altercation. Harbut left A.O.'s home with a Taurus 9 mm handgun and A.O.'s double-bladed knife, under circumstances that were disputed at trial. Law enforcement officers who responded to the scene found the weapons a few houses away under a car.

{¶ 4} Harbut was indicted on September 19, 2023, on one count each of having weapons while under disability, tampering with evidence, felonious assault, and domestic violence; the indictment included forfeiture specifications related to the Taurus 9 mm handgun. Harbut pled not guilty.

{¶ 5} The jury trial occurred on February 6-7, 2024. As to the offense of having weapons while under disability, the court instructed the jury on the defense of duress.

Harbut was found guilty of having weapons while under disability and tampering with evidence; he was found not guilty of felonious assault and domestic violence. The court sentenced him to 36 months for having weapons while under disability and to 24 months for tampering with evidence, to be served consecutively, for an aggregate term of 60 months. The court also ordered that the Taurus 9 mm weapon retrieved from the scene be forfeited to the State.

{¶ 6} Before addressing Harbut's five assignments of error, we will review the evidence presented at trial.

## Jury Trial

{¶ 7} A.O. testified that on September 11, 2023, she resided in Springfield, and Harbut was her ex-boyfriend. They had previously resided together for a period of three weeks while they were in a romantic relationship that lasted for 18 months. According to A.O., Harbut was using methamphetamine at her home on the date of the incident. As his supply ran low, Harbut told A.O. to go to the home of a neighbor, an alleged drug dealer, and acquire some more drugs in exchange for a sexual favor. When A.O. refused, Harbut grabbed her by both of her wrists and "stepped on [her] feet" while she was sitting on her bed; she tried to push him away. When A.O. got loose from Harbut's grip, he stumbled and then picked up a 9 mm handgun that he had brought to her home and laid by the bed. According to A.O., he "smacked" her on the side of her head and face with the gun and kept doing so as she tried to get away. She stated that her stove was near the door to her bedroom, and Harbut grabbed a frying pan from the stove and hit her on the back of her head. A.O. ran to the front door and unlocked it.

{¶ 8} According to A.O., Harbut then "came at" her with her "deceased brother's butterfly knife," which had two blades, and he tried to stab her; they wrestled over the knife. Harbut told A.O. to be quiet, threatened to kill her and her children (who were upstairs) if she screamed, and told her that he had the gun in his pocket, although he did not pull it out. As they struggled, A.O. got past Harbut, reached for her phone that was "hidden by the bathroom," grabbed the phone, got out the door, and called 911. She stated that Harbut also "ran out the door with the gun and knife." A.O. testified that she had not harmed Harbut during the struggle and that she had not sustained any injuries from the knife. She also testified that she had been sober and lucid and had not used any illegal drugs or consumed any alcohol.

{¶ 9} Security camera video from the night of the incident was played for the jury. As the video played, A.O. identified Harbut walking in front of her home; she stated that she had been on the phone with law enforcement at the time. A recording of A.O.'s 911 call was also played for the jury.

{¶ 10} On cross-examination, A.O. testified that she is drug tested monthly because she is prescribed Percocet for back and stomach problems, and that she is also prescribed medication for depression. She stated that the altercation occurred after she and Harbut had "laid in bed all day" and through the evening. According to A.O., they began to argue after she told Harbut to leave. She denied that the gun was hers or providing the serial number of the gun to the police, stating that Harbut always carried that gun.

{¶ 11} Several officer of the Springfield Police Department testified at trial. Officer

Joshua Emory testified that he was dispatched to A.O.'s home on September 11, 2023, on a report of a male subject outside with a gun who had assaulted a female victim. Emory arrived on scene with Officer Chris Kitchen. Harbut was outside the home and cooperated when officers told him to put his hands up; without being asked, he advised officers that he did not have any weapons. Harbut was placed in a cruiser. After being advised of his rights, Harbut agreed to speak to the officers.

{¶ 12} According to Emory, Harbut related that he had been visiting A.O., "hanging out and getting high together, having fun," until they got in an argument about money and "some other small things." Harbut told Emory that A.O. had grabbed the knife and came at him with it, then he had grabbed both of her wrists. Emory testified that Harbut had a cut on one of his arms. Emory had had no contact with A.O. before speaking with Harbut.

{¶ 13} While in the cruiser with Harbut, Emory learned via a radio transmission that other officers had located a gun and knife underneath a car up the street. Emory testified that Harbut overheard the communication regarding the weapons, "hesitated for a minute, paused, and then . . . started telling [Emory] a story again." According to Emory, Harbut stated that A.O. had had the gun and that he had taken it from her; when Harbut saw that A.O. was calling the police, he wiped his fingerprints off the gun and put it under a car because he knew he was not allowed to have the gun. Harbut told Emory that A.O. had hit him with a frying pan, but not very hard. When a medic arrived, a small bandage was placed on the cut on Harbut's arm, and he was taken to the police station.

{¶ 14} Emory reiterated that Harbut had changed his story during their conversation. According to Emory, after Harbut learned that the weapons had been

located, his story about his injuries and what had happened in the house changed. Harbut had not mentioned a gun until after the radio transmission, and then he indicated that the gun belonged to A.O. Emory stated that he did not know if Harbut changed his story due to intoxication or if he was deliberately "making things up." Emory stated that A.O. did not appear to be intoxicated.

{¶ 15} Officer Chris Kitchen testified that he and Emory had responded to A.O.'s address on a report of a male assaulting a female with a knife and a gun. Kitchen spoke with A.O. and described her as "really upset and emotional." Kitchen observed some swelling to her left eye, bruises and redness around her wrists, and "some blood splatter" on her hands and clothes. A.O. did not appear to be under the influence of any alcohol or illegal substances, and her story was consistent throughout their conversation.

{¶ 16} Officer Antonia Turner was dispatched to A.O.'s home on September 11, 2023, on a report of a man and woman fighting and "the female was hit in the head with a firearm." Turner took photos of the scene, including A.O.'s injuries, which she identified at trial. Turner stated that A.O. had not appeared to be under the influence. She identified a photo of the knife and gun under the vehicle where they were found, and she testified that the firearm was loaded when it was found.

{¶ 17} Officer Ashley Walter testified that she responded to A.O.'s address on September 11 and was briefed by other officers about searching for a gun and firearm. Walter looked in the bed of a pickup truck in front of A.O.'s home and then proceeded up the street "just a couple houses" and located "a small handgun and a Batman knife thrown underneath a gold Honda Accord." She identified photos of the weapons under the

vehicle as they were when she found them.

{¶ 18} Sergeant Doug Pergram, the supervisor of the property room, testified that his responsibilities include operability testing on submitted firearms. Pergram performed an operability test on the gun retrieved from the scene and determined it was operable. He described the knife retrieved from the scene as a "black Batman pocket knife with [a] double blade."

{¶ 19} At the conclusion of the State's case, it submitted copy of a judgment entry reflecting that Harbut had been convicted of possession of cocaine on December 17, 2015.

{¶ 20} Defense counsel moved for an acquittal on the charges of domestic violence and having weapons while under disability. The court overruled the motion.

{¶ 21} The defense then presented its case. Harbut testified that he was at A.O.'s home for at least 10 hours before the altercation and that A.O.'s children were upstairs during that time. He stated that he and A.O. were "[h]anging out, doing drugs, fooling around." According to Harbut, A.O. was "doing meth" with him and drinking alcohol. He stated that he and A.O. got into an argument around 4:45 a.m. "over past discrepancies" in their relationship and money that had allegedly been stolen from Harbut by A.O. According to Harbut, as the argument escalated, A.O. told him that she was going to shoot him in the face, he told A.O. that he was going to leave, and she said, "no, you're not leaving." At the time, they were in A.O.'s bedroom. Harbut testified that he knew that A.O. had a gun.

{¶ 22} Harbut testified that, when he tried to leave, A.O. "was already on [him] with

a knife." He did not know where A.O. had gotten the knife. Harbut grabbed her wrists to prevent her from stabbing him. Harbut stated that they "tussled," A.O. dropped the knife, and he tried to calm her down; he didn't realize at first that he had been cut. Harbut pushed A.O. onto the bed and tried to pick up the knife. According to Harbut, A.O. "went for the gun," so he "jumped on her, grabbed her and got the gun."

{¶ 23} Harbut testified that he ran to the kitchen door with the knife and the gun. The door was locked and he tried to unlock it. A.O. ran to the sink, grabbed a skillet, and hit Harbut with it. Harbut testified that he slapped A.O., and she "started going crazy again." He unlocked the door and ran out with the knife and gun. He testified that he took the weapons because he was afraid to leave them with A.O. and was in fear for his life. Harbut stated that he ran to nearby neighbors' homes, "trying to get some witnesses," to no avail.

{¶ 24} According to Harbut, he "went, threw the knife and the gun at one of the houses over there," then went back to A.O.'s home to try to "talk to her some sense, calm her down" and also to get his phone and maybe a ride to his car. Harbut stated that he hid the weapons to keep them away from A.O. According to Harbut, he did not know that A.O. had called the police until he returned to her home without the weapons. Harbut identified himself outside A.O.'s home on the surveillance video; he stated that he had already disposed of the weapons and returned to A.O.'s home at that point, and he wanted A.O. to drive him to his vehicle.

{¶ 25} Harbut testified that the series of events began when he encountered A.O. on September 10, 2023. He was in his vehicle, and she was following him in her car.

Harbut testified that he parked his car and got into A.O.'s car with her. He denied that he did so because he was too intoxicated to drive. Harbut stated that they went to a couple of hotels, but the hotels were too expensive, so they went to A.O.'s home, where they spent the rest of the day and evening until the altercation.

{¶ 26} Harbut testified that he "could have walked off" when he learned that A.O. had called the police, but he remained at the scene because he hadn't done anything wrong. He stated that the police arrived with "guns drawn and very aggressive," so he got on his knees, not knowing what A.O. had reported. Harbut testified that he cooperated in speaking to Emory, but he acknowledged that he was intoxicated at the time. He did not remember telling Emory that he had tried to wipe his fingerprints from the gun, and he did not believe that he had attempted to do so. Harbut acknowledged having a prior drug conviction. He denied hitting A.O. with a frying pan or the gun, but he admitted slapping her as he tried to leave the residence in an attempt to protect himself and get her off of him. On cross-examination, Harbut denied owning the gun.

{¶ 27} The surveillance video was less than a minute in length and was angled from A.O.'s front porch toward the street. In the video, Harbut appeared from the left side before the police arrived, walking past A.O.'s home. He did not appear to be agitated. A.O., who testified that she was on the phone with police in her doorway at the time, can be heard telling Harbut that he was going to jail; he replied that no one was going to jail. Harbut then asked A.O. for a ride to his car. In the 911 call, A.O. told dispatch that Harbut had the knife in his hand and the gun in his pocket.

**Assignments of Error and Analysis**

**{¶ 28}** Harbut's first assignment of error is:

HARBUT'S CONVICTIONS FOR HAVING WEAPONS UNDER DISABILITY AND TAMPERING WITH EVIDENCE ARE NOT SUPPORTED BY LEGALLY SUFFICIENT EVIDENCE OR THE WEIGHT OF THE EVIDENCE.

**{¶ 29}** Regarding the weapons while under disability conviction, Harbut asserts that he established at trial that A.O.'s threatening conduct and statements caused him to fear for his safety such that he was "compelled" to react while under duress. According to Harbut, he "only came into possession of the firearm in order to protect his own life." He asserts that he took the gun and knife from A.O. and hid them outside to protect himself and that there was no evidence to corroborate A.O.'s testimony that the firearm belonged to him or that he struck her with it. He asserts that the jury "clearly rejected" A.O.'s version of events when it acquitted him of felonious assault and domestic violence, so the jury "must have lost its way" in finding that he was not in possession of the gun under duress.

**{¶ 30}** Regarding tampering with evidence, Harbut cites his testimony that he hid the gun and the knife under the car to keep them from A.O., not from the police, and that he did not know that A.O. had called the police until after he hid the weapons. According to Harbut, the surveillance video corroborated his testimony, and A.O. testified that she called the police after Harbut left the apartment.

**{¶ 31}** The State responds that Harbut's own admissions established the offense

of having weapons while under disability: he advised the officers on the scene that he was not allowed to have a gun and testified at trial to a prior drug conviction. The State asserts that the jury clearly did not believe Harbut's version of events when it came to the defense of duress. According to the State, Harbut's argument ignores the multiple inconsistencies in his statements to the police regarding the gun, and Harbut's acquittal on felonious assault and domestic violence did not impugn A.O.'s credibility such that duress was established.

{¶ 32} Regarding the tampering with evidence conviction, the State asserts that Harbut admitted that he wiped the gun of fingerprints and hid it, and he knew an investigation was inevitable because he was inside the apartment when A.O. called police; these factors satisfied the elements of tampering with evidence. Harbut replies that a defendant may dispute the facts as asserted by the State and, alternatively, argue a defense.

Standard of Review

{¶ 33} In *State v. Thompkins*, 78 Ohio St.3d 380 (1997), the Supreme Court of Ohio clarified the distinction between appellate review of the sufficiency of the evidence and appellate review of the weight of the evidence. A sufficiency of the evidence argument relates to whether the State "presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2009-Ohio-525, ¶ 10 (2d Dist.), citing *Thompkins.* "In essence, sufficiency is a test of adequacy. Whether the evidence is sufficient to sustain a verdict is a question of law." *Thompkins* at 386.

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Wilson* at ¶ 11, citing *State v. Jenks*, 61 Ohio St.3d 259 (1991). In other words, on review for sufficiency, courts are to assess not whether the State's evidence is to be believed, but whether, if believed, the evidence would support a conviction. *Thompkins* at 390.

{¶ 34} A weight of the evidence argument, on the other hand, challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive. *Wilson* at ¶ 12, citing *State v. Hufnagel*, 1996 WL 501470, *3 (Sept. 6, 1996).

[T]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*Wilson* at ¶ 13, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). "In order to find that a manifest miscarriage of justice occurred, an appellate court must conclude that a guilty verdict is 'against,' that is, contrary to, the manifest weight of the evidence

presented." *Id.* at ¶ 14, citing *see State v. McDaniel*, 1998 WL 214606 (2d Dist. May 1, 1998).

**{¶ 35}** "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." *State v. Flores-Lopez*, 2017-Ohio-690, ¶ 49 (2d Dist.), citing *State v. McCrary*, 2011-Ohio-3161, ¶ 11 (10th Dist.); *accord State v. Robinson*, 2015-Ohio-1167, ¶ 17 (2d Dist.). As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." *Robinson* at ¶ 17, citing *State v. Braxton*, 2005-Ohio-2198, ¶ 15 (10th Dist.).

**{¶ 36}** The credibility of the witnesses and the weight to be given to their testimony are primarily matters for the trier of fact to resolve. *Wilson* at ¶ 15, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967).

> Because the factfinder . . . has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness. . . .

*State v. Lawson*, 1997 WL 476684, *4 (2d Dist. Aug. 22, 1997). Thus, we will not substitute our judgment for that of the trier of fact on the issue of witness credibility "unless

it is patently apparent that the trier of facts lost its way in arriving at its verdict." *Wilson* at ¶ 17, citing *State v. Bradley*, 1997 WL 691510, *4 (2d Dist. Oct. 24, 1997).

### 1. Having Weapons while under Disability

{¶ 37} R.C. 2923.13 proscribes having weapons while under disability and states: Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:

. . .

(3) The person is under indictment for or has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse . . .

{¶ 38} "In order to establish the defense of duress, the defendant must demonstrate that he was compelled to commit the crime under threat, by another person, of imminent death or serious bodily injury." *State v. Longstreth*, 2022-Ohio-1825, ¶ 12 (2d Dist.), citing *State v. Lawson*, 2008-Ohio-1311, ¶ 19 (2d Dist.), citing *State v. Elijah*, 2000 WL 968781 (2d Dist. July 14, 2000). " 'The force used to compel the actor's conduct must remain constant, controlling the will of the unwilling actor during the entire time he commits the act, and must be of such a nature that the actor cannot safely withdraw.' " *Id.,* citing *Lawson,* citing *State v. Getsy*, 1998-Ohio-533. "Although the defendant must subjectively believe that he is being threatened with imminent death or serious bodily harm if he does not commit the crime, that belief must be objectively reasonable based on the evidence." *Id.,* citing *Elijah*; *State v. Doakes*, 2002-Ohio-6995

(2d Dist.).

{¶ 39} Harbut admitted his prior felony drug offense, and the judgment entry of conviction was admitted into evidence. In addition, A.O. testified that Harbut owned the gun and brought it to her home before the altercation, and that he "always carrie[d] that gun." Officers Emory and Kitchen testified that A.O. did not appear to be intoxicated, and Kitchen testified that A.O.'s version of events was consistent throughout his encounter with her. The jury obviously credited A.O.'s testimony on the disputed facts, and we defer to the jury's credibility assessment.

{¶ 40} Officer Emory's testimony cast doubt on Harbut's credibility because he said that Harbut had changed his story as the events unfolded. The jury could have reasonably concluded that Harbut did so in a self-serving manner: he initially told Emory that he did not have any weapons, until he learned that the weapons had been found; only then did he admit to having handled the weapons, knowing that he was not allowed to have a gun, and to attempting to remove his fingerprints from the gun. Emory testified that it was unclear to him whether Harbut was "making things up" or changing his story due to his intoxication.

{¶ 41} Based on this evidence, the jury was free to reject the defense of duress. In other words, the jury was free to discredit Harbut's testimony that he had been compelled to remove a weapon belonging to A.O. from her home under threat of imminent death or serious bodily injury by her. Harbut's calm demeanor in the video and his request for a ride to his car before police arrived did not support his assertion that he was in fear for his life from a threat from A.O. only moments before. Contrary to his

assertions, the video was not exculpatory. There was sufficient evidence to support Harbut's conviction for having weapons while under disability, and that conviction was not against the manifest weight of the evidence.

### 2. Tampering with Evidence

**{¶ 42}** R.C. 2921.12 proscribes tampering with evidence: "(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following: (1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation . . ."

**{¶ 43}** As noted above, A.O. testified that Harbut removed his gun from her home. Emory testified that Harbut told him he "saw that [A.O.] was calling the police" and admitted wiping off the gun and hiding it because he was aware he was under disability. We find that the evidence supported the conclusion that Harbut knew an investigation was likely to be instituted and that he acted to remove the gun and impair its availability as evidence; therefore, his conviction for tampering with evidence is supported by sufficient evidence and was not against the manifest weight of the evidence.

**{¶ 44}** Harbut's first assignment of error is overruled.

**{¶ 45}** Harbut's second assignment of error is:

> THE STATE ENGAGED IN PROSECUTORIAL MISCONDUCT WHEN IT MISCHARACTERIZED THE EVIDENCE DURING CLOSING ARGUMENTS.

**{¶ 46}** Harbut directs our attention to the following remarks in the State's closing

argument regarding the offense of tampering with the evidence.

> Mr. Harbut wants you to believe that he had no idea that 911 was called when he hid those weapons. Really? Why did you hide them under a car and try to wipe off the gun? Why did you do that? And listen to the 911 call because his voice is on there.
>
> If you didn't know she was calling 911, you're in the room when she's doing it. You're there. You're around. You know.

**{¶ 47}** According to Harbut, the evidence conclusively showed that he went outside with the gun and knife and only walked back into the apartment to discover A.O. on the phone with the police after he had hid the weapons. In other words, he claims that the State mischaracterized the evidence and misled the jury into believing that he knew an investigation would ensue -- "one of the most difficult elements" of a tampering with evidence for the State to prove.

**{¶ 48}** The State responds that Harbut did not object to the portion of the closing argument set forth above, so this error is subject to plain error review. The State also asserts that Harbut mischaracterizes A.O.'s testimony and considers his own "as gospel." According to the State, the "prosecutor's argument on this point is not likely to have changed the outcome."

**{¶ 49}** It is true that Harbut failed to object to the prosecutor's remarks in closing argument, "thereby waiving all but 'plain error.' " *State v. Twitty*, 2002-Ohio-5595, ¶ 28 (2d Dist.), citing *State v. Bey*, 85 Ohio St.3d 487, 494 (1999). "Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have

been different." *Id.*, citing *State v. Wickline*, 50 Ohio St.3d 114 (1990). "With respect to prosecutorial misconduct, the test is whether the remarks or conduct were improper and, if so, whether it prejudicially affected substantial rights of the defendant." *Id.*, citing *State v. Hartman*, 93 Ohio St.3d 274, 294; *State v. Lott*, 51 Ohio St.3d 160, 165 (1990).

{¶ 50} The trial court instructed the jury that closing arguments are not evidence. Moreover, the remarks about the 911 call were consistent with Officer Emory's testimony that Harbut advised him that he had wiped down the gun and hid it with the knife because he knew that A.O. was calling the police and he was aware that he was under disability. Accordingly, we find that the remarks were not improper. Having reviewed the entire trial transcript and concluded that Harbut's convictions were supported by sufficient evidence and not against the manifest weight of the evidence, we cannot conclude that the outcome of the trial would have been different in the absence of the remarks quoted above. In other words, we see no error, much less plain error. Harbut's second assignment of error is overruled.

{¶ 51} Harbut's third assignment of error is:

THE TRIAL COURT VIOLATED HARBUT'S RIGHT TO ALLOCUTE

AT THE APPROPRIATE TIME AS REQUIRED BY CRIM.R. 32.

{¶ 52} Harbut argues that Ohio law clearly provides that the defense "gets the last word before sentence is imposed," not the State, and the State got the last word at his sentencing, introducing information to which he did not have an opportunity to respond. He argues that he is entitled to be resentenced. The State concedes that the allocution was improper and that the case should be remanded for a resentencing hearing. We

reject the parties' conclusion that the allocution was improper for the following reasons.

{¶ 53} "Pursuant to Crim.R. 32(A)(1), at the time of sentencing, the trial court must '[a]fford counsel an opportunity to speak on behalf of the defendant and address the defendant personally and ask if he or she wishes to make a statement in his or her own behalf or present any information in mitigation of punishment.' " *State v. Brown*, 2022-Ohio-4314, ¶ 7 (2d Dist.). " 'If the court imposes sentence without affording the defendant an opportunity to allocute, then resentencing is required unless the error was invited or harmless.' " *Id.*, quoting *State v. Beasley*, 2018-Ohio-493, ¶ 22, citing *State v. Osie*, 2014-Ohio-2966, ¶ 179.

{¶ 54} "A trial court errs when it does not let the defendant address new information introduced and considered by the trial court at sentencing." (Citations omitted.) *State v. Yates*, 2011-Ohio-3619, ¶ 21 (2d Dist.). "The error is presumed prejudicial, because the defendant is prevented from speaking at the appropriate time." *Id.*, citing *State v. Sanders*, 2003-Ohio-1163, ¶ 13-16 (8th Dist.) (the trial court erred in not allowing defendant to address evidence introduced after defendant's statement, which the trial court considered before imposing sentence.)

{¶ 55} "Courts have found the prejudice presumption rebutted when the defendant declined to speak at the proper time or the new evidence is extraneous." *Id.* at ¶ 22, citing *State v. Storey*, 2006-Ohio-3498, ¶ 40 (8th Dist.) "The error will also be harmless when the defendant does not object to the new information or if the court's reasons for the enhanced sentence are unrelated to it." *Id.*, citing *State v. Clark*, 2006-Ohio-1421, ¶ 7 (3d Dist.).

{¶ 56} The record reflects that, at sentencing, defense counsel spoke on Harbut's behalf and requested community control or a minimum sentence. Harbut then spoke briefly and apologized. The State recommended 24 months on each count based upon Harbut's criminal history.

{¶ 57} The court addressed Harbut as follows:

Okay. Start with the jury didn't believe you, Mr. Harbut, that you were only in possession of that firearm out of necessity to protect yourself and to protect others. The jury didn't believe that. They found you guilty of having weapons while under disability and so that's what the Court is going to sentence you on . . . . And that's concerning to the Court that somebody with your prior record is carrying a firearm. So that's one thing.

Another thing is your prior record, aggravated burglary, first degree felony, failure to comply, third degree felony, gross sexual imposition, either a third of forth degree felony, possession of cocaine, criminal non-support, possession of cocaine, failure to verify your change of address, aggravated possession of drugs, and now having weapons while under disability, and tampering with evidence.

Then as I look through your prior record and I'm looking at the sentences you received, what jumps out at me is the fact that you've committed all of these felony offenses and your punishment has been relatively minimal. Community control for the aggravated burglary, I don't know what the circumstances were there but that's somewhat shocking.

Failure to comply, 15 months, that's less than half of the maximum penalty. Gross sexual imposition . . . and the possession of cocaine for a total of 18 months because those sentences ran concurrently with one another.

The criminal nonsupport, possession of cocaine, failure to verify your change of address, 24 months which is somewhat significant but yet it ran concurrently with the sentences for the other felonies so there you're getting a break for concurrent sentences. Aggravated possession of drugs, community control, third degree felony, community control, so what I'm looking at here is somebody that continues to commit serious criminal offenses and the punishment is just not sufficient to get you to stop. You want to say something about that?

THE DEFENDANT: Yes, sir. Yes, sir. Due to the fact that I was, for lack of a better words, uneducated, maybe, and didn't even know or was probably educated in right or wrong and even if I, even if I spoke on the aggravated burglary it was when I was 19 and I was arguing with a girl. The guy that was with me had kicked her door. I stayed there. I was there when the arguing, when the police came, didn't even know that he had stole a radio out of the house.

I didn't even, and the laws had just changed which it would have been a criminal trespass but the laws had just changed like a couple months before in October and I did get a lenient sentence. I stayed out of trouble for years and years before I even made another mistake fumbling through

life - -

THE COURT:   Okay.   Hold on one second, Mr. Harbut.

. . .

THE COURT:   Two years later you committed a failure to comply.

THE DEFENDANT:   Yes.

. . .

THE COURT:   So that's not years and years of being a law abiding citizen.

THE DEFENDANT:   No, sir.   I was not a law, I admit I was not a law abiding citizen at that point, no.   . . . There was times that I did get in trouble.   There's nothing I can say.   I mean, I got punished but this time I definitely, I have, I know what the difference between right and wrong.   I have worked on myself.   I have definitely, full of honesty now instead of lying and manipulating.

I have lied and I am human but I am not out here committing criminal acts.   I am a tax paying citizen now.   I own my own company.   I paint. Anywhere I can help anybody, provide any service, I do that.   I am not the same person that I used to be, like far from that person, you know.   Yeah, I did make a mistake that night, that 9/11 and I can admit that I was in possession of a firearm.   I shouldn't have been.

Now, whatever sentence you imply on me, I do pray that it be lenient. I will never, ever do that again.   I am not the same person I used to be.   I

am trying to work on becoming self-aware and do the right thing in society and become a productive member of society with every inch of me.

[PROSECUTOR]:   Your Honor, the State feels the need to respond, if I may, just briefly.   Mr. Harbut just sat there and said that he is honest. And the problem that the State has with that, Mr. Harbut, is that I've listened to jail calls since this decision was handed down, since the jury reached a decision in which Mr. Harbut stated on a jail call that, I was riding around with the gun and it caught up with me, which means that when he was on the stand testifying he was not being honest.

So if you are in treatment and you are in recovery and you are being honest about what happened, how do you get up and perjure yourself?

The court then proceeded to impose consecutive sentences.

{¶ 58} There was no objection to the prosecutor's comments about the jail phone calls.   Although Harbut was not given an opportunity to address the prosecutor's remarks about Harbut's admissions on the jail calls that he had been in possession of the weapon, Harbut had admitted to the court, "*I did make a mistake that night, that 9/11 and I can admit that I was in possession of a firearm. I shouldn't have been*."   In other words, Harbut admitted committing the offense.   As such, we conclude that Harbit could not have been prejudiced by the State's statements.   Moreover, the court's reasons for imposing consecutive sentences were unrelated to the prosecutor's remarks about the jail phone calls.   It was significant to the court that Harbut, with his lengthy criminal history, was in possession of a firearm, falsely represented himself as law abiding for

"years and years," and that his multiple prior punishments were concurrent or lenient and had failed to dissuade Harbut from further crime. In other words, the error was harmless. Accordingly, Harbut's third assignment of error is overruled.

**{¶ 59}** Harbut's fourth assignment of error is as follows:

**{¶ 60}** THE TRIAL COURT FAILED TO CALCULATE HARBUT'S JAIL TIME CREDIT AS REQUIRED BY R.C. 2929.19.

**{¶ 61}** Harbut acknowledges that he failed to object to the imposition of jail time credit. He argues, however, that plain error is demonstrated. The State concedes error.

**{¶ 62}** Harbut is correct that he "waived all but plain error for purposes of appeal" regarding jail time credit. *State v. Litteral*, 2024-Ohio-2092, ¶ 19 (2d Dist.), citing *State v. McDonald*, 2015-Ohio-1911, ¶ 13 (1st Dist.). R.C. 2967.191 governs credit for confinement while awaiting trial and commitment and requires the Ohio Department of Rehabilitation and Correction ("ODRC") to reduce a felony offender's prison term "by the total number of days that the prisoner was confined for any reason arising out of the offense for which the prisoner was convicted and sentenced[.]" "Although R.C. 2967.191 imposes a duty on the [ODRC] to credit a prisoner for his or her pretrial confinement, it is the trial court's responsibility to make the factual determination as to the number of days of confinement that a defendant is entitled to have credited toward his or her sentence." *Litteral* at ¶ 21, citing *State ex rel. Rankin v. Ohio Adult Parole Auth.*, 2003-Ohio-2061, ¶ 7. "A defendant must be informed of the total number of days of jail-time credit to which he or she is entitled at the time of sentencing, up to and including the sentencing date, and such number must be included in the sentencing entry." *Id.*, citing R.C.

2929.19(B)(2)(g)(i).

**{¶ 63}** *Litteral* further noted as follows:

Although the trial court erred in calculating Litteral's jail-time credit, an inaccurate determination of jail-time credit "is not grounds for setting aside the offender's conviction or sentence and does not otherwise render the sentence void or voidable." R.C. 2929.19(B)(2)(g)(iv). Crim.R. 36 provides that "[c]lerical mistakes in judgments, orders, or other parts of the record, and errors in the record arising from oversight or omission, may be corrected by the court at any time." "The rule thus authorizes a trial court to, at any time, enter judgment nunc pro tunc to the date of the original conviction, correcting a mistake of fact, but not an error of law, in the jail-time credit specified in a judgment of conviction." *State v. Gonzalez*, 1st Dist. Hamilton No. C-150582, 2017-Ohio-7301, ¶ 9. Accordingly, under these circumstances, the trial court may remedy the error by issuing nunc pro tunc judgment entries that reflect the correct number of days of jail-time credit. *State v. Davis*, 2d Dist. Montgomery No. 27495, 2018-Ohio-4137, ¶ 17.

*Id.* at ¶ 26.

**{¶ 64}** Here, at sentencing, the court advised Harbut, "You will receive credit for time spent in the Clark County Jail towards your sentence." The judgment entry was silent as to jail time credit. We conclude that the error here was more than the type of clerical oversight contemplated by Crim.R. 36. The court did not inaccurately determine

Harbut's jail time credit; rather, it did not calculate it at all. Further, jail time credit accrues for the period of time in confinement prior to sentencing, but not any time thereafter while awaiting transport to the facility, and this distinction was not made clear to Harbut at disposition. Harbut was merely advised that he would receive credit for time spent in jail. *See State v. Davis,* 2018-Ohio-4137, ¶ 14 (2d Dist.) ("At the time of sentencing, the trial court has no way of knowing how long it will take a defendant to be transported to prison after the defendant has been sentenced; therefore, any days the defendant spends in confinement while awaiting transportation to prison cannot properly be included in the trial court's jail-time credit calculation.") Given the trial court's total failure to calculate jail time credit, we conclude that the court must reduce the amount of Harbut's credit to a number of days and provide an opportunity for Harbut to be heard regarding this calculation. Harbut's fourth assignment of error is sustained.

{¶ 65} Harbut's fifth assignment of error is:

THE TRIAL COURT ERRED WHEN IT ORDERED THE FIREARM

TO BE FORFEITED AS PART OF HARBUT'S SENTENCE.

{¶ 66} Harbut asserts that the jury failed to make a forfeiture finding for the 9mm handgun. He further argues that the trial court failed to instruct the jury regarding the forfeiture, include a forfeiture finding on the jury form, or give the jury any other opportunity to determine whether the gun should be forfeited. According to Harbut, the evidence at trial "strongly" suggested that A.O. owned the weapon and, in the absence of a "formal finding" by the trier of fact that it belonged to him, the trial court "may have ordered the forfeiture . . . in contravention of law." The State concedes error, acknowledging that the

absence of a forfeiture determination by the jury precluded the forfeiture.

{¶ 67} "In general, forfeiture of property is disfavored." (Citations omitted.) *State v. Poirier*, 2021-Ohio-1743, ¶ 25 (2d Dist.) "The State's ability to seek forfeiture of property is created by statute and, whenever possible, forfeiture statutes must be construed to avoid forfeiture." *Id.*

{¶ 68} R.C. 2981.03(A)(2) permits "[a] law enforcement officer [to] seize property that the officer has probable cause to believe is property subject to forfeiture." R.C. 2981.01(B)(13) defines property subject to forfeiture, and the definition includes contraband. " 'A prosecuting attorney may then pursue forfeiture of seized property in a criminal proceeding under R.C. 2981.04 . . .' " *State v. Leet*, 2021-Ohio-1334, ¶ 12 (2d Dist.), quoting *State v. Recinos*, 2014-Ohio-3021, ¶ 21 (5th Dist.). R.C. 2941.1417 provides that property is not subject to forfeiture in a criminal case unless the indictment charging the offense specifies certain information including a description of the property, to the extent reasonably known at the time of filing. R.C. 2981.04 states that, if a person is convicted of an offense and the indictment charging the offense contains a specification covering property subject to forfeiture under R.C. 2981.02, "the trier of fact shall determine whether the person's property shall be forfeited."

{¶ 69} Here, although the indictment contained a forfeiture specification for the firearm, the jury did not determine whether the firearm was subject to forfeiture. The court's judgment entry, however, ordered that "the Taurus 9mm Model A2675 firearm is forfeited to the State." The trial court's forfeiture order was contrary to the procedures set forth in R.C. Chapter 2981. As such, Harbut's fifth assignment of error is sustained.

**Conclusion**

**{¶ 70}** For the reasons set forth above, Harbut's convictions were supported by sufficient evidence and were not against the manifest weight of the evidence; prosecutorial misconduct is not demonstrated; and Harbut's right to allocution was not violated. The matter is reversed and remanded for the trial court to calculate Harbut's jail time credit, and the trial court's forfeiture order is vacated. In all other respects, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

EPLEY, P.J. and LEWIS, J., concur.